## Continuation of Application for Search Warrant

Based on my knowledge, training and experience, and the investigation of law enforcement officers with personal knowledge and with whom I am working, I, Heather Williamson, being duly sworn, depose and state as follows:

### INTRODUCTION

1. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically, Title 21, United States Code, Sections 841(a)(1) and 846, Conspiracy to Possess with Intent to Distribute Controlled Substances, will be found on certain electronic devices (hereinafter the "**Subject Devices**," described more fully in Attachment A). The categories of electronically stored information and evidence sought are described in Attachment B.

2. This Application requests the issuance of a warrant to examine the **Subject Devices** which were seized on November 7, 2019, and November 13, 2019, following traffic stops, which resulted in the seizure of the **Subject Devices** and approximately $2,137 US currency, 3 grams crack cocaine, and 32 grams fentanyl/heroin mixture.

### APPLICANT'S TRAINING AND EXPERIENCE

3. I am a Special Agent of the Drug Enforcement Administration ("DEA") and have been so employed since January 2013. I am currently assigned to the Grand Rapids District Office. Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and

FBI, and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa Cartel.  I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials.  I have investigated drug trafficking organizations in relation to violations of federal laws such as unlawful importation of controlled substances, the distribution of controlled substances, manufacturing controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, and other dangerous drugs, as well as money laundering.

4.     I also know from training and experience that drug traffickers frequently utilize mobile telephones and other electronic devices, such as tablets and laptop and desktop computers, to facilitate drug trafficking.  Mobile telephones are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so narcotics traffickers often use the devices in an effort to avoid detection by law enforcement. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls and text messages with suppliers of narcotics; voicemail messages; photographs of drugs, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high

drug trafficking areas or evidencing the route used in trafficking narcotics. Additionally, drug traffickers typically maintain and use multiple mobile phones to facilitate sales, and frequently switch phones to evade detection by law enforcement. Further, these types of devices are frequently used to access social media websites such as Facebook, Instagram, etc. In my training and experience, drug traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of narcotics.

5. Similarly, I also know from training and experience that drug traffickers use tablets, laptop and desktop computers to further their activities by, for example, producing and maintaining drug ledgers and other financial records, photos/videos of drug trafficking and/or associates, and other related digital files. Storing this information can be intentional by the user, such as saving an e-mail as a file on the computer or tablet or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally without the user's specific knowledge. This might include traces of the path of an electronic communication being automatically stored in many places, such as temporary files or Internet service provider (ISP) client software, or files that were previously viewed or deleted being retained in "free disk" space. In addition to electronic communications, a computer or tablets user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains certain file sharing software, when the computer was sharing files, and some of the files

which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data. I also know from training and experience that drug traffickers utilize cameras and video cameras to take photos/video of narcotics, currency, high value items and coconspirators.

## PROBABLE CAUSE

6. Since November 2019, agents and officers from the DEA Grand Rapids District Office ("GRDO"), Michigan State Police ("MSP"), and West Michigan Enforcement Team ("WEMET") have been conducting a join investigation into a drug trafficking organization that includes DARESE SANDERS[1], XZAVIUS COLEMAN and MAREECO BROWN (the "SANDERS DTO"). The investigation revealed that the SANDERS DTO distributes quantities of crack cocaine, heroin and fentanyl throughout the greater Muskegon area, frequently accompanied by the use of firearms and other acts of violence.

7. On November 7, 2019, investigators located a dark gray Dodge Challenger bearing California license 8CBP664 sitting outside of the Rodeway Inn located at 4620 Airline Road in the city of Muskegon. Investigators were familiar with this vehicle based on prior observations of XZAVIUS COLEMAN being the driver of the vehicle, specifically the day before on November 6. Investigators know from prior narcotics investigations that XZAVIUS COLEMAN frequently sells drugs out of that vehicle in Muskegon. Investigators initiated surveillance on the vehicle

---

[1] On or about November 7, 2019, WEMET Detectives were asked to assist the Violent Crimes Task Force in locating DARESE SANDERS for an open homicide investigation. WEMET Detectives were familiar with associates of SANDERS, based on prior drug investigations in and around the greater Muskegon area.

and observed COLEMAN in the driver's seat of the vehicle as it was parked at the Rodeway Inn. At approximately 11:35 a.m., investigators observed the vehicle leave the parking lot of the Rodeway Inn and park in front of a liquor store. Investigators continued to surveil the vehicle, during which they observed several individuals approach the driver's and passenger's side of the door briefly. This behavior is consistent with drug trafficking, specifically conducting hand to hand deals through a car window. At approximately 11:46 a.m., investigators observed a black male walk up to the passenger side of the Dodge Challenger and get inside. It appeared that the black male came from the direction of the Rodeway Inn. Shortly thereafter, XZAVIUS COLEMAN, driving the Dodge Challenger, pulled out of the liquor store parking lot to Airline Road and turned westbound. Investigators observed that the vehicle did not come to a complete stop while leaving the private driveway and did not have the vehicle turn signal on. Investigators continued surveillance and with the assistance of Michigan State Police troopers, initiated a traffic stop on the vehicle.

8.   XZAVIUS COLEMAN was identified as the driver of the vehicle and MAREECO BROWN[2] was identified as the passenger of the vehicle. As BROWN was exiting the vehicle, investigators observed Brown holding two separate cell phones: a black phone in a turquoise case (SUBJECT DEVICE #1, I-PHONE 7 Model # MNA72LL/A bearing Serial Number F4GV1RLGHG6W) and another black phone in

---

[2] A records check of both occupants revealed a felony warrant for Dangerous Drugs out of the 58th District Court of Grand Haven for MAREECO BROWN.

a black and dark blue case (SUBJECT DEVICE #2, a I-PHONE 7 Model # MNA72LL/A bearing Serial Number F71SH2PDHG7P and IMEI 359212076228202).

9. Brown was handcuffed by Trooper Rothermal and asked to walk back to the patrol vehicle. While Brown was being placed in handcuffs, investigators observed BROWN leaning his hips and lower body to the left. Investigators further observed BROWN leaning while walking as if trying to conceal something in his groin area. Detective Hopkins moved BROWN's right leg out and shook his right pants leg and observed a plastic sandwich baggie with a chunky brownish substance suspected to be heroin fall out of his pants near his ankle onto the ground. After the suspected heroin was found XZAVIUS COLEMAN was asked to step out of the vehicle and was placed in handcuffs. COLEMAN was searched by Detective Hopkins and only had a white I-phone in a pink/red case located on his person. Inside of the vehicle, were several loose unused plastic sandwich baggies in the glove box and in the center console. There were also plastic sandwich baggies that appeared to be used, and were missing a corner as if it were torn off. Plastic sandwich baggies are commonly used to package suspected narcotics in order to be sold. In the passenger side seat where BROWN was sitting was a black and yellow coat later confirmed to be BROWN'S. Inside of the right pocket Detective Merkins found approximately $928 US currency. Located in the drivers' seat was a black I-phone in a black case, later confirmed to be COLEMAN's by his mother.

10. Both BROWN and COLEMAN were transported to the City of Muskegon Police Department to be interviewed. COLEMAN declined to speak with

investigators and was subsequently released. BROWN provided investigators limited information and was subsequently held in custody on the Ottawa County warrant. The suspected heroin was tested with the Trunarc and tested positive for the presence of heroin and fentanyl.

11.    On November 13, 2019, investigators received information that DARESE SANDERS was driving a silver Dodge Charger bearing Michigan license CXV006. Investigators located the vehicle at 3333 Maffett Street in the city of Muskegon Heights. Investigators initiated surveillance on the vehicle throughout the city of Muskegon Heights to the city of Norton Shores, at which time marked Michigan State Police Troopers initiated a traffic stop on the vehicle for window tint.

12.    After the Dodge Charger was stopped, Detective Hopkins approached the passenger side of the vehicle where XZAVIUS COLEMAN was standing outside of the vehicle with Trooper Sanders being handcuffed, and Trooper Morrow was handcuffing DARESE SANDERS[3] on the driver's side. COLEMAN was detained and checked for weapons. Based on investigator's training and experience it is common for suspects to pass contraband to include drugs or weapons to their close associate to avoid detection. While being checked for weapons a white I-Phone 6 with a pink/red phone case (SUBJECT DEVICE #3, I-PHONE 6S Model: A1688/ FCC ID: BCG-E2946A/ IC: 579C-E2946A) fell out of COLEMAN's right pant leg near the ankle as if it was being held in his groin area.

---

[3] Through prior investigation and knowledge, it was known that XZAVIUS COLEMAN is a close associate and business partner of DARESE SANDERS, and SANDERS had a felony warrant for homicide where a gun was used.

13. It is common for suspects to conceal contraband to include narcotics in their groin area to avoid detection. Detective Hopkins proceeded to run the back of his hand in the inner portion of COLEMAN's thigh and felt a very hard ball-like object that did not feel consistent with human anatomy near COLEMAN's groin area. At this point Detective Hopkins grabbed the hard item and removed it by sliding it through the clothing until it fell out the upper band of his pants. The hard ball turned out to be a full plastic sandwich bag further containing two corner tie baggies. One corner tie baggie contained a white chunky substance which was consistent with suspected crack cocaine and the other corner tie baggie contained a brown chunky substance which is consistent with suspected heroin. The suspected 3.0gm of crack cocaine was tested with the TruNarc. The suspected crack cocaine returned positive for cocaine base. The suspected 6.0gm of heroin was tested with the TruNarc. The suspected heroin returned positive for heroin with fentanyl compound or methamphetamine

14. Subsequently, COLEMAN was secured in Trooper Sanders' vehicle and investigators began searching the Dodge Charger with Trooper Morrow. Detective Hopkins observed a black and red I-phone (SUBJECT DEVICE #6, Red I-PHONE 11 Model: Product Red) connected to a charger cord that Trooper Sanders stated was also stuffed in the front of COLEMAN'S pants when Troopers first made contact with him. Located in the passenger side seat was a dark blue Kyocera flip phone (SUBJECT DEVICE #4) and a small working digital scale made by "Triton-M".

Located in the back pocket of the passenger side seat was another digital scale in the box with the name "Triton-T3r" written on it.

15. Located in the driver's seat was another dark blue Kyocera flip phone (SUBJECT DEVICE #5) wedged in the seat. Under the drivers' seat was another Triton-T3 digital scale with a suspected narcotic residue on the weigh plate. Inside of the center console was large quantity of small denominations in US currency. The total amount that was seized was $1,209 US currency.

16. Based on the information set forth above, the physical evidence seized (including approximately $2,137 US currency, 3 grams crack cocaine, and 32 grams fentanyl/heroin mixture and the **Subject Devices**); and my knowledge, training and experience in drug trafficking investigations, I respectfully submit there is probable cause to believe additional evidence of drug trafficking will be found in electronic format on the **Subject Devices**. In this case, five cell phones were located as a result of the traffic stops conducted on November 11 and November 13, 2019. Two cell phones were located on MAREECO BROWN. Three cell phones were located on and inside the vehicle of XZAVIUS COLEMAN. Based on the totality of the circumstances discussed above, there is probable cause to believe that those **Subject Devices** will contain contact lists, telephone logs, photographs and other data that relate to drug trafficking and drug traffickers. A description of each device and its location and relevance to the investigation is described below:

    a. I-PHONE 7 Model # MNA72LL/A bearing Serial Number F4GV1RLGHG6W and IMEI 355826087928643 (Subject Device #1)

b. I-PHONE 7 Model # MNA72LL/A bearing Serial Number F71SH2PDHG7P and IMEI 359212076228202 (Subject Device #2)

c. I-PHONE 6S Model: A1688/ FCC ID: BCG-E2946A/ IC: 579C-E2946A (Subject Device #3)

d. VERIZON KYOCERA flip phone (Subject Device #4)

e. KYOCERA flip phone (Subject Device #5)

f. I- Red I-PHONE 11 Model: Product Red (Subject Device #6)

17. The **Subject Devices** are currently in storage at the WEMET office in Muskegon, Michigan. The **Subject Devices** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **Subject Devices** were first seized by DEA and WEMET on November 7 and November 13, 2019.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18. The warrant applied for would authorize the extraction and copying of electronically stored information, all under Rule 41(e)(2)(B).

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate forensic electronic evidence that establishes how the **Subject Devices** were used, the purpose of the use, who used them, and

when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

21.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

22.   I respectfully submit that there is probable cause to believe that DARESE SANDERS, XZAVIUS COLEMAN, MAREECO BROWN and other members of the SANDERS DTO have engaged in the distribution of, and in the possession with intent to distribute, heroin and cocaine, and that they have conspired

to do the same, in violation of 21 U.S.C §§ 841 and 846.  I submit that this application supplies probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the items described in Attachment B.